UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08 –

| | |
|---|---|
| ERIC J. SAX,<br><br>PLAINTIFF<br><br>vs.<br><br>DANIEL A. DiPRETE,<br>THE IMAGING INSTITUTE, INC. and<br>TII RADIOLOGISTS, INC.,<br><br>DEFENDANTS | COMPLAINT<br>and<br>JURY DEMAND |

Plaintiff Eric J. Sax, by his attorneys, sets forth the following as his Complaint against defendants Daniel A. DiPrete, The Imaging Institute, Inc. and TII Radiologists, Inc.:

**Parties**

1. Plaintiff Eric J. Sax (*"Dr. Sax"*) is an individual residing at 9 Old Sudbury Road, Lincoln, Massachusetts 01773 and a physician trained and skilled in the field of radiology.

2. On information and belief defendant Daniel A. DiPrete (*"Dr. DiPrete"*) is an individual residing at 380 Ocean Road, Narragansett, Rhode Island 02882 and a physician trained and skilled in the field of radiology.

3. On information and belief defendant The Imaging Institute, Inc. (*"TII"*) is a Rhode Island corporation with its principal place of business at 250 Toll Gate Road, Warwick, Rhode Island 02886, of which Dr. DiPrete is the sole owner, the President, Treasurer and Secretary and the sole controlling person.

4. On information and belief defendant TII Radiologists, Inc. (*"TII Radiologists"*) is a Rhode Island corporation with its principal place of business at 250 Toll Gate Road, Warwick, Rhode Island 02886, of which Dr. DiPrete is the sole owner, the President, Treasurer and Secretary and the sole controlling person.

5. Throughout the course of the dealings between Dr. Sax and Dr. DiPrete described in this Complaint, Dr. DiPrete presented and conducted himself and his entities as a single enterprise under his control, disregarding his entities' corporate separateness, confusingly intermingling their activities and using them interchangeably as he saw fit.

### Jurisdiction and Venue

6. This Court has jurisdiction over the subject matter of this action by virtue of 28 U. S. Code §1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and Dr. Sax and each of the defendants – Dr. DiPrete, TII and TII Radiologists – are citizens of different States.

7. This Court has personal jurisdiction over each of the defendants – Dr. DiPrete, TII and TII Radiologists – pursuant to Massachusetts General Laws chapter 223A, §3, the Massachusetts "long arm" statute.

8. Venue is proper in this district under 28 U. S. Code §1391(a) inasmuch as a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this district.

### Facts

9. Dr. Sax has been a practicing physician licensed in Massachusetts since July 1990 and a credentialed radiologist since July 1992.

10. Dr. Sax is widely recognized as a leader in his field, currently serving as a member of the Executive Committee of the Massachusetts Radiological Society, of which he is a past President, and as a delegate to the Massachusetts Medical Society.

11. In April 2000 Dr. Sax entered employment in the radiology department of Newton-Wellesley Hospital, a Tufts Medical School teaching hospital in the Partners Health Care System, 8½ miles from his family home in Lincoln, Massachussetts.

12. At Newton-Wellesley Hospital Dr. Sax rose to become the Chief of Nuclear Medicine, the Medical Director of the Newton-Wellesley Hospital PET/CT Center and a Clinical Instructor of Radiology at Tufts Medical School, with the strong prospect of further advancement in the future.

13. In or about early June 2005 Dr. Sax received an unsolicited telephone call from A. J. Rachiele, who identified himself as a medical executive recruiter retained by a thriving technical imaging and professional interpretation practice in Rhode Island (the *"Practice"*) which was seeking to bring in as a partner a prominent radiologist to build the Practice and participate in its growth.

14. Dr. Sax initially rebuffed Mr. Rachiele's overtures, stating that he was extremely content where he was and that he had no desire to explore any other position.

15. Mr. Rachiele persisted, however, and during several further telephone conversations in late June or July 2005 he informed Dr. Sax that the Practice represented an "exceptional opportunity … the best he had ever seen," because if Dr. Sax performed well, he could acquire a share not only of the professional services business but also of the "technical profits" – that is, the profits derived from imaging services – "at a nominal buy-in with little risk."

16. Relying on these representations – and particularly Mr. Rachiele's statement that he would have the opportunity to share in "technical profits ... at a nominal buy-in with little risk" – Dr. Sax agreed to speak with the Practice's owner, who Mr. Rachiele then identified as Dr. DiPrete.

17. In or about July 2005 Dr. DiPrete telephoned Dr. Sax in Massachusetts on at least three occasions, and during the course of these conversations Dr. DiPrete represented at length the nature of the opportunity he was offering Dr. Sax including, but not limited to, the statements specifically set forth below.

18. In telephone conversations, a meeting, and at least one written communication (an email dated July 27, 2005, a complete and accurate copy of which is attached to this Complaint as **Exhibit A**) in mid and late July 2005, Dr. Sax informed Dr. DiPrete that joining the Practice would be a "big investment and risk" for Dr. Sax because, among other things, Dr. Sax's annual income from the Practice would be at least $150,000 less than his then current income at Newton-Wellesley Hospital.

19. In telephone conversations and a meeting in mid and late July 2005, Dr. DiPrete assured Dr. Sax that Dr. Sax would more than make up the income shortfall – $150,000 annually, or $300,000 over two years – within the first year after he became Dr. DiPrete's partner in the Practice.

20. In telephone conversations, a meeting and at least one written communication (**Exhibit A**), in mid and late July 2005, Dr. DiPrete acknowledged that he was asking Dr. Sax to give up a "secure position" just a few minutes commuting time from Dr. Sax's home in Lincoln.

21. In telephone conversations, a meeting and at least one written communication (**Exhibit A**) in mid and late July 2005, Dr. DiPrete told Dr. Sax that the Practice was highly successful and growing; that he intended and expected to grow the Practice more; and that given his qualifications, Dr. Sax would be the ideal physician to participate in and benefit from that growth.

22. In telephone conversations in mid and late July 2005 Dr. DiPrete represented to Dr. Sax that Dr. DiPrete was then the only shareholder in the Practice, including both its technical imaging and professional interpretation components.

23. In telephone conversations, a meeting and at least one written communication (**Exhibit A**) in mid and late July 2005, Dr. DiPrete represented to Dr. Sax that Dr. Sax's buy-in price, if he was offered a partnership, would be determined pursuant to a "very reasonable" formula: $75,000 for each $600,000 of the Practice's net income, multiplied by the percentage representing Dr. Sax's equal share of the Practice – 50% if there were two partners, 33⅓% if there were three partners and so forth – payable over three years if the total price was $75,000 or less, or payable over three to five years if the total price was over $75,000.

24. In telephone conversations, a meeting and at least one written communication (**Exhibit A**) in mid and late July 2005, Dr. DiPrete represented to Dr. Sax that he was offering him a "great opportunity" to acquire an ownership interest at a "nominal buy-in" with "excellent pre- and post-partnership compensation and relatively little risk."

25. During a personal meeting at TII in Warwick, Rhode Island, on or about July 15, 2005, Dr DiPrete repeated and expanded the statements he had made to Dr. Sax

described in ¶¶19 through 24, above, including, but not limited to, the statement that buying into the Practice's technical imaging business, as well as its professional interpretation component, for a "nominal price," was an "incredible opportunity" and that he hoped Dr. Sax would "join" him.

26. In a telephone conversation following their meeting at TII, Dr. DiPrete offered Dr. Sax the opportunity to buy into in the Practice on a percentage basis equal to that of the other shareholders, conditioned on Dr. Sax entering the Practice as an employee for two years and performing at a satisfactory level.

27. During the telephone conversation described in ¶26, above, Dr. DiPrete, in response to Dr. Sax's question, explicitly assured Dr. Sax that the offer to buy into the Practice included both its technical and professional services components.

28. Relying on Dr. DiPrete's explicit and repeated representations, Dr. Sax executed an employment agreement with TII dated July 27, 2005, a complete and accurate copy of which is attached to this Complaint as **Exhibit B**, with his employment to begin in January 2006.

29. The employment agreement between TII and Dr. Sax provides, in ¶12, as follows:

> After Twelve (12) months of employment the Corporation shall notify the Doctor as to whether the Doctor shall be offered partnership upon completion of the Term, on an equal basis as the other shareholders, with proportionate compensation.

30. Dr. DiPrete's representations to Dr. Sax set described in ¶¶19 through 27, above – including, most importantly, the "nominal buy-in price" for his equal percentage of the Practice, including its technical imaging aspect – were material to Dr. Sax's

decision to leave his position at Newton-Wellesley Hospital and join the Practice in Rhode Island.

31.  But for Dr. DiPrete's explicit and repeated representations to Dr. Sax described in ¶¶19 through 27, above, Dr. Sax would not have left Newton-Wellesley Hospital and accepted a position with the Practice.

32.  In January 2006 Dr. Sax left his position at Newton-Wellesley Hospital and began working for the Practice.

33.  The payroll checks compensating Dr. Sax for his services, and the checks reimbursing Dr. Sax for his business-related expenses, were variously written on bank accounts in the names of TII and TII Radiologists.

34.  The emails, memoranda and other work-related written communications Dr. Sax received were variously sent by TII and TII Radiologists.

35.  Dr. Sax's services for the Practice were excellent, far more than sufficient to meet Dr. DiPrete's conditional partnership offer.

36.  Throughout the term of Dr. Sax's employment by the Practice, Dr. DiPrete frequently expressed his complete satisfaction, and never expressed any dissatisfaction, with Dr. Sax's services.

37.  Dr. DiPrete sent Dr. Sax a letter dated January 22, 2007, a complete and accurate copy of which is attached to this Complaint as **Exhibit C**, stating that he would be offered partnership in January 2008 at the conclusion of their agreement's two-year term, with work on the appropriate documents to commence three months before the term ended.

38. The statements contained in the January 22, 2007 letter were material to Dr. Sax's decision to remain with the Practice and he relied on them in making that decision.

39. From January 2007 forward Dr. Sax continued to perform at an excellent level and Dr. DiPrete frequently commended him on the high quality of his services.

40. During Dr. Sax's employment, Dr. DiPrete – largely as a result of Dr. Sax's performance and ability to attract new business – increased the number of the Practice's imaging facilities from one to five and, on information and belief, the Practice's net income rose dramatically.

41. Based on the terms of the agreement, Dr. DiPrete's confirmation of Dr. Sax's performance and the other facts described above, Dr. Sax was entitled to buy-in to the Practice on the agreed terms in January 2008.

42. Notwithstanding the terms of the agreement and Dr. Sax's performance, in or about late November and early December 2007, when Dr. Sax raised the terms of the offer of partnership and sought to exercise his buy-in right at the agreed price, Dr. DiPrete purported to repudiate the agreed buy-in price and to add new terms.

43. Instead of honoring the agreement, Dr. DiPrete proposed a deal that bore little resemblance to the agreement and would have imposed terms that were much less favorable to Dr. Sax.

44. In or about early December 2007, when Dr. Sax asked on several occasions to review financial information pertaining to the Practice, Dr. DiPrete informed Dr. Sax that he would not permit him access to that information unless he signed a confidentiality agreement, a complete and accurate copy of which is attached to this

Complaint as **Exhibit D**, with TII, TII Radiologists and another entity owned and controlled by Dr. DiPrete, Atlantic Commercial, LLC.

45. After Dr. Sax signed the confidentiality agreement he reviewed the financial information Dr. DiPrete provided to him, but found it to be incomplete and virtually useless for his purposes, thus rendering it impossible for Dr. Sax to fairly consider Dr. DiPrete's proposal.

46. Despite Dr. Sax's repeated demands, Dr. DiPrete adamantly refused to honor the agreed buy-in price and other material terms of the agreement.

47. Dr. Sax did not agree to pay the new price and informed Dr. DiPrete that unless Dr. DiPrete honored their agreement, Dr. Sax would leave the Practice in mid-January 2008, when their agreement expired.

48. Dr. DiPrete did not honor the agreement, but instead presented Dr. Sax with a form of release dated January 15, 2008, between Dr. Sax, on one hand, and Dr. DiPrete and TII, on the other hand, a complete and accurate copy of which is attached to this Complaint as **Exhibit E**.

49. The form of release dated January 15, 2008, among other things, would have released Dr. Sax's claims against not only against TII and but also against Dr. DiPrete personally, in exchange for certain payments to Dr. Sax, and would have released the claims of TII and Dr. DiPrete personally against Dr. Sax.

50. Dr. Sax refused to sign the form of release dated January 15, 2008 and left his employment by Dr. DiPrete in mid-January 2008.

51. By virtue of the manner in which Dr. DiPrete presented and conducted himself and his entities during the course of his interactions with Dr. Sax described in this

Complaint, Dr. Sax was from time to time unsure as to whether he was dealing with Dr. DiPrete personally, with one or both separate entities or with Dr. DiPrete's radiological practice as a whole.

52. By virtue of the manner in which Dr. DiPrete presented and conducted himself and his entities during the course of his interactions with Dr. Sax described in this Complaint, Dr. DiPrete, TII and TII Radiologists are jointly and severally liable to Dr. Sax under all Counts of this Complaint.

53. On information and belief as of January 2008 the equal percentage share in the Practice that Dr. Sax was entitled to purchase under the agreement, had a value of at least $4,000,000, substantially in excess of the agreed buy-in price of $75,000 for each $600,000 of the Practice's net income, multiplied by the percentage representing Dr. Sax's equal share of the Practice.

## COUNT I
### (Breach of Contract vs. Dr. DiPrete, TII and TII Radiologists)

54. Dr. Sax repeats and incorporates the foregoing allegations as if fully restated herein.

55. Dr. Sax fully performed his obligations under the agreement to the complete satisfaction of Dr. DiPrete.

56. In December 2007 Dr. Sax was ready, willing and able to exercise his right to purchase an interest in the Practice on the agreed terms.

57. In December 2007 Dr. Sax sought to exercise his right to purchase an interest in the Practice on the agreed terms.

58.  Dr. DiPrete, TII and TII Radiologists breached their agreement to sell Dr. Sax purchase an interest in the Practice on the agreed terms but instead demanded that Dr. Sax pay a far higher price for an equal share of the Practice and agree to other new terms that were much less favorable to Dr. Sax.

59.  The breach of the agreement by Dr. DiPrete, TII and TII Radiologists caused Dr. Sax to suffer substantial damages, in an amount to be determined at trial.

## COUNT II
### (Breach of the Covenant of Good Faith and Fair Dealing vs. Dr. DiPrete, TII and TII Radiologists)

60.  Dr. Sax repeats and incorporates the foregoing allegations as if fully restated herein.

61.  Dr. DiPrete, TII and TII Radiologists, on one hand, and Dr. Sax, on the other hand, were subject to the implied covenant of good faith and fair dealing in their interactions with each other pursuant to the agreement.

62.  The implied covenant of good faith and fair dealing imposed on the parties to the agreement the mutual obligation to take all steps reasonably necessary to effectuate the agreement's objectives and to refrain from acting in any manner which damaged or destroyed the agreement's objectives.

63.  Dr. Sax fulfilled in all respects his covenant of good faith and fair dealing to Dr. DiPrete, TII and TII Radiologists pursuant to the agreement.

64.  Through their failure to act reasonably in calculating the buy-in price under the agreement, Dr. DiPrete, TII and TII Radiologists breached their covenant of good faith and fair dealing to Dr. Sax pursuant to the agreement.

65. The breach by Dr. DiPrete, TII and TII Radiologists of their covenant of good faith and fair dealing to Dr. Sax pursuant to the agreement caused Dr. Sax to suffer substantial damages, in an amount to be determined at trial.

## COUNT III
### (Fraud in the Inducement vs. Dr. DiPrete, TII and TII Radiologists)

66. Dr. Sax repeats and incorporates the foregoing allegations as if fully restated herein.

67. Dr. DiPrete, acting personally and on behalf of TII and TII Radiologists, made numerous material misrepresentations to Dr. Sax calculated to induce Dr. Sax to leave a secure position and join the Practice.

68. Dr. DiPrete, TII and TII Radiologists made the misrepresentations to Dr. Sax knowing they did not intend to honor the buy-in terms of the agreement.

69. Dr. DiPrete, TII and TII Radiologists made the misrepresentations to Dr. Sax knowing their falsity.

70. Dr. DiPrete, TII and TII Radiologists made the misrepresentations to Dr. Sax knowing that Dr. Sax would reasonably rely on them in entering into the agreement.

71. Dr. Sax reasonably relied on the misrepresentations of Dr. DiPrete, TII and TII Radiologists in entering into the agreement and joining the Practice and would not have entered into the agreement and joined the Practice but for those misrepresentations.

72. As a result of Dr. DiPrete's, TII's and TII Radiologists' fraudulently inducing Dr. Sax to enter into the agreement and join the Practice with no intention of fulfilling their obligations to him, Dr. Sax has suffered substantial damages – including,

but not limited to, the loss of his position and opportunity to advance at Newton-Wellesley Hospital, Partners Health Care System and Tufts Medical School; the loss of $300,000 in income Dr. Sax would have received in his prior position compared with his income from the Practice; the loss of the value of his percentage of the Practice above the price he agreed to pay for it; and the loss of his share of the Practice's future profit stream – in an amount to be determined at trial.

**Prayer for Relief**

**Wherefore** Dr. Sax prays that this Court:

(a)  Enter judgment in favor of Dr. Sax against Dr. DiPrete, TII and TII Radiologists on Count I of this Complaint;

(b)  Enter judgment in favor of Dr. Sax against Dr. DiPrete, TII and TII Radiologists on Count II of this Complaint;

(c)  Enter judgment in favor of Dr. Sax against Dr. DiPrete, TII and TII Radiologists on Count III of this Complaint;

(d)  Award Dr. Sax damages on each of Counts I, II and III of this Complaint, in amounts to be determined;

(e)  Award Dr. Sax the costs and expenses he incurs in connection with this action, including attorneys' fees;

(f)  Find Dr. DiPrete, TII and TII Radiologists jointly and severally liable for all amounts awarded to Dr. Sax; and

(g)  Order such other and further relief as this Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

ERIC J. SAX

By his attorneys,

/s/ William A. DeVasher, Jr.
William A. DeVasher, Jr. (BBO #552010)
Michael B. Cosentino (BBO #558036)
Molly Cochran (BBO# 551833)
Seegel Lipshutz & Wilchins LLP
20 William Street, Suite 130
Wellesley, Massachusetts 02481
(781) 237-4400

Dated: September 29, 2008

354147.7