UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-11662-RGS

ERIC J. SAX

v.

DANIEL A. DiPRETE, THE IMAGING INSTITUTE,
AND TII RADIOLOGISTS, INC.

MEMORANDUM AND ORDER ON MOTION
FOR JUDGMENT ON THE PLEADINGS

August 6, 2009

STEARNS, D.J.

On September 29, 2008, Dr. Eric J. Sax sued defendants Daniel A. DiPrete, The

Imaging Institute, Inc. (TII), and TII Radiologists, Inc. (TIIR), alleging breach of contract

(Count I), breach of the covenant of good faith and fair dealing (Count II), and fraud in the

inducement (Count III).  On February 2, 2009, defendants moved for judgment on the

pleadings.  The court heard oral argument on July 27, 2009 .

FACTUAL BACKGROUND

The facts viewed in the light most favorable to Sax as the non-moving party are as

follows.  Dr. Sax has been licensed to practice medicine in Massachusetts since July of

1990.  He became a licensed radiologist in July of 1992.  He is well regarded in the field

of radiology, and is currently a member of the Executive Committee of the Massachusetts

Radiological Society.

In April of 2000, Sax joined the radiology department of Newton-Wellesley Hospital

(Newton-Wellesley), a Tufts Medical School (Tufts) teaching hospital affiliated with the

Partners Health Care System. At Newton-Wellesley, Sax served as Chief of Nuclear Medicine and as Medical Director of the PET/CT Center.  He also taught at Tufts as a Clinical Instructor of Radiology.

In June of 2005, Sax received an unsolicited telephone call from an A. J. Rachele[1], who identified himself as an executive recruiter retained by a thriving technical imaging and professional interpretation practice based in Rhode Island (Practice).  Rachele told Sax that the Practice was looking to partner with a prominent radiologist.  Sax initially rebuffed Rachele's overtures, stating that he was not interested.  Rachele persisted. During conversations that lasted into July of 2005, Rachele told Sax that he would not only be offered a share of the Practice, but also the "technical profits" derived from the imaging services.  Rachele promised Sax a "nominal buy-in with little risk."  Sax agreed to speak with the owner of the Practice, defendant Daniel DiPrete.

During the course of three telephone calls to Sax and one exchange of emails, DiPrete explained the offer in more detail.  Sax expressed concern that the offer entailed a substantial personal financial risk.  Sax noted that the proposed salary was $150,000 less than what he was currently earning at Newton-Wellesley.  DiPrete assured Sax that he would more than make up the difference within a year of becoming a partner. DiPrete acknowledged that Sax would be giving up a secure position and an easy commute, but represented that the Practice was successfully established and thriving.  DiPrete also stated that he was currently the sole shareholder in the Practice.  During the discussions,

_____

[1]Defendants' memorandum points out that Sax's Complaint misspells Rachele's name as Rachiele.

DiPrete proposed that the partnership buy-in price be determined according to a "reasonable" formula: $75,000 for each $600,000 of net income, paid out as a percentage of Sax's share of the Practice. DiPrete iterated these representations during an in-person meeting. Finally, in a follow-up telephone call, DiPrete stated that Sax would be given the opportunity to buy into the Practice as an equal shareholder if he were to first enter the Practice as an employee and perform at a satisfactory level.

In an email discussing a proposed employment contract, Sax requested that the agreement state that he would be given an opportunity to purchase a share of the Practice equal to what the (then) other partners owned,[2] and that the buy-in price be stipulated as $75,000 (to be paid over a defined time). DiPrete countered that Sax would be "offered . . . an equal percentage basis as other shareholders, with proportionate compensation." He explained that if the buy-in price was frozen at $75,000, Sax's income as a shareholder would be limited to $600,000. DiPrete stated that if the Practice's earnings grew more quickly than expected, the buy-in price would be higher, but still very "reasonable." As to the term of the buy-in, DiPrete proposed three years (if the buy-in was $75,000), or between three and five years if the price was higher.

Relying on DiPrete's representations, Sax signed an employment agreement with TII dated July 27, 2005, which included the following provision (Section 12):

> After Twelve (12) months of employment, the Corporation shall notify the Doctor as to whether the Doctor shall be offered partnership upon completion of the Term, on an equal percentage basis as other

---

[2]In the email, Sax asked that he be given an opportunity to purchase a third of the Practice's shares, presumably as an equal partner with Di Prete and another partner not identified in the pleadings.

shareholders, with proportionate compensation.

The agreement also contained an integration clause: "This Agreement supersedes and replaces any and all prior agreements between the parties hereto."

Sax began employment at the Practice in January of 2006. All of Sax's employment-related communications, including payroll checks and reimbursement checks for business expenses, were signed by either TII or TIIR. Through the course of Sax's employment, DiPrete expressed complete satisfaction with his services. At the completion of his first year of employment, Sax received a letter from DiPrete indicating that he would be offered a partnership in January, 2008 (at the end of his second year of employment). Sax remained with the Practice in anticipation of becoming a partner.

During the course of Sax's employment, the Practice experienced a rapid growth in income. In December of 2007, when Sax sought to exercise the buy-in, DiPrete suggested a buy-in price that was higher than what had been discussed (or that Sax expected).[3] Sax then asked to review the Practice's financial information, which DiPrete provided on the condition that Sax sign a confidentiality agreement. Sax found the information incomplete and unhelpful. Sax alleges that an equal share of the Practice as of January 2008 was worth at least $4,000,000. Sax did not agree to DiPrete's terms and stated that he would be leaving the Practice in January, 2008 upon the expiration of his existing contract. DiPrete sent Sax a form release dated January 15, 2008. Sax was offered a payment in exchange for a release of any claims against DiPrete and TII. Sax refused to sign the release and left the Practice.

---

[3]The Complaint does not indicate the actual buy-in terms offered to Sax.

4

This lawsuit followed. Among other relief, Sax seeks to hold DiPrete, TII, and TIIR jointly and severally liable for any money damages that he might be awarded.

DISCUSSION

Where the well-pleaded facts permit a court to infer only the mere *possibility* of misconduct, a complaint has alleged, but it has not shown, that the plaintiff is entitled to relief. Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1951-1952 (2009). A motion to dismiss brought after a complaint is answered is treated as a motion for judgment on the pleadings. Fed. R. Civ. P. 12(c) permits a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed," as long as the motion does not delay the trial. A Rule 12(c) motion differs from a Rule 12(b)(6) motion in that it implicates the pleadings as a whole. "In the archetypical case, the fate of such a motion will depend upon whether the pleadings, taken as a whole, reveal any potential dispute about one or more of the material facts." Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 38 (1st Cir. 2004). In reviewing a motion under Rule 12(c), as in reviewing a Rule 12(b)(6) motion to dismiss, a court may consider documents the authenticity of which are not disputed, documents that are central to a plaintiff's claim, and documents that are sufficiently referred to in the complaint itself. See Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007). If the motion introduces materials outside the record that is accepted by the court, the Rule 56 standard applies thereby "erect[ing] a hurdle for the nonmovant that is far more difficult to clear than the relatively modest hurdle posed by Rule 12(c) simpliciter." Reder, 355 F.3d at 38.

In deciding a motion for judgment on the pleadings (as with brevis motions generally), a federal court applies the choice-of-law framework of the forum state in

5

reviewing state-law claims. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). "A federal court sitting in diversity need not [, however,] make a finding regarding which state's law is to be applied where the case's resolution would be identical under either state's law." Fratus v. Republic W. Ins. Co., 147 F.3d 25, 28 (1st Cir. 1998).

The contractual dispute at the heart of this motion for judgment on the pleadings rises or falls on the parole evidence rule. This rule limits proof of an oral agreement made prior to or contemporaneous with a written contract depending on how fully the contract is integrated; the extrinsic evidence rule is related to the parole evidence rule, but is not identical. See Sunoco, Inc. v. Makol, 372 F.3d 31, 36 n.1 (1st Cir. 2004). The parole evidence rule is applied congruently by the courts of Rhode Island and Massachusetts. "[T]he parol-evidence rule bars the use of any previous or contemporaneous oral statements that attempt to modify an integrated written agreement." Nat'l Refrigeration, Inc. v. Standen Contracting Co., Inc., 942 A.2d 968, 972 (R.I. 2008) (internal citations omitted). "Evidence of prior or contemporaneous oral agreements cannot be admitted to vary or modify the terms of an unambiguous written contract." Fairfield 274-278 Clarendon Trust v. DEK, 970 F.2d 990, 993 (1st Cir. 1992), citing New England Fin. Res., Inc. v. Coulouras, 30 Mass. App. Ct. 140, 145 (1991) (emphasis in original). Also, "parol evidence may not be used to 'create ambiguity where none otherwise exists.'" Rey v. Lafferty, 990 F.2d 1379, 1385 (1st Cir. 1993), quoting Boston Car Co., Inc. v. Acura Auto. Div., Am. Honda Motor Co., Inc., 971 F.2d 811, 815 (1st Cir. 1992). Rather, "parties are bound by the plain terms of their contract." Hiller v. Submarine Signal Co., 325 Mass. 546, 550 (1950). Where these are unambiguous, the parties' subjective contemplations or

expectations are immaterial. <u>Blakeley v. Pilgrim Packing Co.</u>, 4 Mass. App. Ct. 19, 24 (1976). <u>See</u> <u>Coll v. PB Diagnostic Sys., Inc.</u>, 50 F.3d 1115, 1122 (1st Cir. 1995).

The nearly insurmountable hurdle Sax faces in prosecuting his contract claim is the integration clause contained in the employment agreement. The question of contract integration is one of fact reserved for the trial judge. <u>Cambridgeport Sav. Bank v. Boersner</u>, 413 Mass. 432, 436-437 n.7 (1992). The integration rule is not always an iron wall. "The integrated documents barrier may be penetrated by evidence tending to show that the documents are not, in fact, complete, . . . or that the execution and delivery of the documents were induced by fraud." <u>Hogan v. Reimer</u>, 35 Mass. App. Ct. 360, 364-365 (1993). For example, in cases of fraudulent inducement, relief is not barred even where the parties are sophisticated and their bargaining powers are equal. <u>Shawmut-Canton LLC v. Great Spring Waters of Am., Inc.</u>, 62 Mass. App. Ct. 330, 335 (2004). "[E]vidence of the contract negotiations and the circumstances of its execution are [also] always admissible to show whether the contract was intended by the parties as an integrated (i.e., final) expression of the terms of their agreement or to show the existence of any uncertainties in the contract's application." <u>Fred S. James & Co. of New England, Inc. v. Hoffman</u>, 24 Mass. App. Ct. 160, 163 (1987). <u>See</u> <u>also</u> <u>Charles River Mortgage Co. v. The Baptist Home of Massachusetts, Inc.</u>, 36 Mass. App. Ct. 277, 279 (1994). <u>Compare</u> <u>Amerada Hess Corp. v. Garabedian</u>, 416 Mass. 149, 155 (1993).

The integration rule, however, is a complete bar to the use of parole evidence to insert a term into a contract that the parties neither bargained for nor agreed to include. Sax's employment agreement omitted any buy-in terms, and did not specify a methodology

7

for calculating a buy-in.  The only reference to a partnership offer was the obligation placed on TII to notify Sax prior to the conclusion of his term of employment as to whether he would receive a buy-in offer or not.   That obligation was undisputedly fulfilled. Moreover, Sax's Complaint does not identify any term of the employment contract that was in fact breached.  It alleges only that DiPrete and TII failed to offer the buy-in terms that had been discussed in the pre-contractual negotiations, terms that Sax had come to believe would be ultimately offered.  Consequently, Sax's breach of contract claim fails as a matter of law.

Sax argues, in the alternative, that Section 12 of the contract is not unambiguous. Specifically, he alleges that the phrase "equal percentage basis as other shareholders, with proportionate compensation" is incomplete and must be viewed through the prism of extrinsic evidence.  Extrinsic evidence is admissible to assist the factfinder in ascertaining the intent of the parties as imperfectly expressed in ambiguous contract language.  In descending order of importance extrinsic evidence may include:  (1) the parties' negotiations; (2) their course of performance; (3) their prior course of dealing; and (4) trade usage in the relevant industry.  Den Norske Bank AS v. The First Nat'l Bank of Boston, 75 F.3d 49, 52-53 (1st Cir. 1996).  "The modern approach . . . allows extrinsic evidence to 'interpret' even a seemingly unambiguous contract, but not to vary or contradict its terms." Fleet Nat'l Bank v. H&D Entm't, Inc., 96 F.3d 532, 539 (1st Cir. 1996) (but observing that Massachusetts by and large tends to the "older view").  While Section 12  of the contract might be thought to be incomplete (in the sense that it does not specify numerical buy-in terms), it is not ambiguous and can only be read as deferring the

negotiations of a buy-in to a later time when (and if) Sax was to be offered a partnership. An agreement to negotiate does not create a binding contract. See Bell v. B.F. Goodrich Co., 359 Mass. 763, 763 (1971). "An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto." Rosenfield v. U.S. Trust Co., 290 Mass. 210, 217 (1935). See also Lucey v. Hero Int'l Corp., 361 Mass. 569, 574-575 (1972) ("An agreement to enter into a contract which leaves the terms of the contract for future negotiation is too indefinite to be enforced.").

The Complaint next alleges that DiPrete, TII, and TIIR breached the covenant of good faith and fair dealing. "Every contract implies good faith and fair dealing between the parties to it." Warner Ins. Co. v. Comm'r of Ins., 406 Mass. 354, 362 n.9 (1990), quoting Kerrigan v. Boston, 361 Mass. 24, 33 (1972). Under the covenant, "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-472 (1991). See also Rhode Island Charities Trust v. Engelhard Corp., 109 F. Supp. 2d 66, 73-74 (D.R.I. 2000). Want of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will." Hartford Acc. & Indem. Co. v. Millis Roofing & Sheet Metal, Inc., 11 Mass. App. Ct. 998, 999-1000 (1981); Schwanbeck v. Fed. Mogul Corp., 31 Mass. App. Ct. 390, 404 (1991) (same), rev'd on other grounds, 412 Mass. 703 (1992). Where a duty of good faith and fair dealing is alleged to arise from a contractual relationship, a claim for breach of that duty sounds in contract rather than tort. Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 10 (1st Cir. 1994).

9

"The covenant may not, however, be invoked to create rights and duties not otherwise provided for in an existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). A breach of the covenant of good faith and fair dealing must be premised on a contractual obligation, because "[a]n implied duty presupposes that an obligation exists." Dovenmuehle Mortgage, Inc. v. Antonelli, 790 A. 2d 1113, 1115 (R.I. 2002) (the absence of a contractual obligation to pay certain taxes precluded, as a matter of law, a finding that the covenant of good faith and fair dealing had been breached by a failure to pay those taxes). Because the contract between Sax and TII imposed only an obligation to negotiate a buy-in price if and when a partnership offer was extended to Sax, there is no contractual duty to trigger the covenant of good faith and fair dealing. Accordingly, Count II of Sax's Complaint is also not actionable.

Finally, Sax alleges fraud in the inducement, arguing that DiPrete, TII, and TIIR made numerous "material misrepresentations" to inveigle him into leaving his job at Newton-Wellesley to join the Practice, knowing throughout that they never intended to follow through on the promise that Sax would eventually be made a partner. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).[4] Sax alleges that he joined the Practice

---

[4]"[G]eneral averments of the defendants' knowledge of material falsity will not suffice. Consistent with Fed. R. Civ. P. 9(b), the complaint must set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading. The rule requires that the particular times, dates, places or other details of the alleged fraudulent

10

relying specifically on DiPrete's representations as to a buy-in price of $75,000 or some "reasonably" adjusted alternative.[5]  Sax further alleges that DiPrete made repeated statements that Sax was being "offered a great opportunity to have an ownership interest at a nominal buy-in" in their email correspondence attached to the Complaint, and in telephonic and in-person conversations.  These details sufficiently satisfy the "who, what, where, and when" pleading requirement of a fraud claim.  See Rodi v. S. New England Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004) (The specificity requirement "extends only to the particulars of the allegedly misleading statement itself. . . . The other elements of fraud, such as intent and knowledge, may be averred in general terms.").

Defendants argue that the Sax's claim of fraud in the inducement must fail because his reliance on terms discussed prior to the execution of the employment agreement  was

_____

involvement of the actors be alleged."

Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994) (citations and internal quotation marks omitted).  The heightened pleading standard is satisfied by an averment "of the who, what, where, and when of the allegedly false or fraudulent representation."  Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).  The Rule 9(b) pleading standard applies to state law fraud claims brought in federal court.  Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 427 (1st Cir. 2007).  When the opposing party is the only practical source for discovering the specific facts supporting a pleader's conclusion, a court may allow some discovery before requiring a plaintiff to plead individual acts of fraud with particularity.  Boston & Maine Corp. v. Hampton, 987 F.2d 858, 866 (1st Cir. 1993).

[5]Under Massachusetts law, "[t]he parol evidence rule does not apply when the complaining party alleges fraud in the inducement." In re Leary, 241 B.R. 266, 270 (Bankr. D. Mass. 1999), citing McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 711 n.5 (1990).  Although Massachusetts law applies to an alleged tortious act of fraudulent inducement where a citizen of Massachusetts is lured into a contractual relationship with a citizen of Rhode Island, the reciprocal law of Rhode Island is not contradictory. See Bjartmarz v. Pinnacle Real Estate Tax Serv., 771 A.2d 124, 127 (R.I. 2001).

unreasonable. "In order to establish a claim for fraudulent inducement, the plaintiff must establish the elements of common law deceit, which include, 'misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statements to the detriment of the person relying.'" Gargano v. Nat'l Floors Direct, 2008 WL 1932077, at *2 (Mass. Super., 2008), quoting Commerce Bank & Trust Co. v. Hayeck, 46 Mass. App. Ct. 687, 692 (1999). It is true that reliance on representations that contradict the terms of a written contract between the parties is unreasonable. See Turner v. Johnson & Johnson, 809 F.2d 90, 97 (1st Cir. 1986) (rejecting deceit claim where the alleged oral representation was flatly inconsistent with a contract provision specifically addressing the particular point at issue). However, it is equally well-established that a party may not contract itself out of a fraud claim by the use of general disclaimers or integration clauses. See, e.g. Sandler v. Elliott, 335 Mass. 576, 580 (1957); Bates v. Southgate, 308 Mass. 170, 176-177 (1941); New England Found. Co., v. Elliott A. Watrous, Inc., 306 Mass. 177, 181 (1940); Connelly v. Fellsway Motor Mart, 270 Mass. 386, 389 (1930).[6] Here, the

---

[6]In Bates, the Court discussed the policy behind its holding as follows:

As a matter of principle it is necessary to weigh the advantages of certainty in contractual relations against the harm and injustice that result from fraud. . . . The same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices. In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement. . . . To refuse relief would result in opening the door to a multitude of frauds and in thwarting the general policy of the law.

Bates, 308 Mass. at 182.

employment agreement does not include buy-in terms that flatly contradict any of the extrinsic buy-in discussions (in fact, the contract includes no buy-in terms at all). Therefore, there is no contractual term to contradict Sax's allegations of an improper inducement.  The reasonableness of Sax's reliance on the prior discussion of the buy-in terms is a matter for the jury and not the court.[7]  See Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 242 (D. Mass. 1999).

ORDER

For the foregoing reasons, defendants' motion for judgment on the pleadings as to Counts I and II is ALLOWED. The motion as to Count III is DENIED.  An extension of time until August 17, 2009, is granted to file a response to Plaintiff's [docket # 21] Motion to Compel Production of Documents and Answers to Interrogatories.  An extension of time until September 4, 2009, is granted with respect to Defendants' [docket # 19] Motion for Extension of Time to Complete Discovery.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[7]As the only claim going forward is that of fraud in the inducement, all defendants are jointly and severally liable if DiPrete made representations to Sax in both his personal capacity and in his official capacity as the controlling officer of TII and TIIR.  Whether he did so (Sax alleges that he did) is also a matter reserved for the jury.